## A10A0324. McKINLEY v. THE STATE.
### (692 SE2d 787)

ELLINGTON, Judge.

A Gwinnett County jury found Marcus McKinley guilty beyond a reasonable doubt of two counts of robbery by intimidation, OCGA § 16-8-40 (a) (2), as a lesser included offense of armed robbery, OCGA § 16-8-41 (a), and hijacking a motor vehicle, OCGA § 16-5-44.1 (b). The charged offenses concerned a single transaction, and the trial court determined that the two counts of robbery merged. Following the denial of his motion for a new trial, McKinley appeals, contending, inter alia, that the evidence was insufficient and that the trial court abused its discretion in admitting certain hearsay evidence. For the reasons explained below, we reverse.

1. McKinley contends there was no credible evidence that he participated in the robbery, either directly or as a party to the crime.

> On appeal from a criminal conviction, [the appellate court] view[s] the evidence in the light most favorable to the verdict and an appellant no longer enjoys the presumption of innocence. [The appellate court] determines whether the evidence is sufficient under the standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979), and does not weigh the evidence or determine witness credibility. Any conflicts or inconsistencies in the evidence are for the jury to resolve. As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, [the appellate court] must uphold the jury's verdict.

(Citations omitted.) *Rankin v. State*, 278 Ga. 704, 705 (606 SE2d 269) (2004). The standard of *Jackson v. Virginia* is met if the evidence is

sufficient for any rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crime charged. *Clark v. State*, 275 Ga. 220, 221 (1) (564 SE2d 191) (2002).

Viewed in the light most favorable to the verdict, the evidence showed the following. On the morning of June 18, 2007, the victim was delivering packages for the carrier DHL when he noticed that a gray car was following him. At approximately 10:00 a.m., just after the victim had delivered a package near Gwinnett Place Mall and returned to his delivery van, a man pressed a handgun into the victim's side and said, "You know what it is." The victim got out of the driver's seat, leaving the van running. The robber drove away in the van and turned north on Pleasant Hill Road, followed by the gray car. The victim called 911, reported the carjacking, and described the robber as an African-American male, approximately 25 to 35 years of age, approximately 6 feet tall and 200 pounds, wearing blue jeans and a blue shirt with white lettering.

A few minutes after the victim's 911 call, an officer spotted the stolen delivery van being driven south on Satellite Boulevard by an African-American male. The officer briefly lost sight of the van, surmised that the robber had turned into The Falls apartment complex, and then found the van parked there adjacent to a gray Chevrolet Malibu. He saw two African-American males running away from the van and the car. Some packages from the van were on the back seat and in the open trunk of the Malibu; others were on the ground beside the van. McKinley's driver's license and cell phone were on the front seat of the Malibu. Officers also found papers, including a Hertz agreement renting the Malibu to McKinley, three traffic citations issued to McKinley that required him to appear in the DeKalb County Recorder's Court on the day of the robbery, and papers concerning a Volkswagen Golf, showing that McKinley had purchased and insured the car.

While officers were taking the victim to The Falls to identify the stolen van, another officer encountered brothers Donelle and Jahan Mims at a gas station less than half a mile away from the apartments. Donelle and Jahan, who are McKinley's cousins, both fit the general description the victim gave of the robber and, as described by the officer, they were "both dripping from head to toe with sweat, like they just got done jogging or running or working out of some sort." Donelle was wearing a blue t-shirt and tan pants and had fresh scratches on his arm.

An officer took the victim to the gas station to see the Mims brothers. At the show-up, the victim did not identify either Donelle or Jahan as the robber. Later, the victim viewed a photographic lineup but was not able to positively identify the robber. Along a path between the apartments where the DHL van was abandoned and the

gas station where the Mims brothers were arrested, officers found the keys to the Malibu lying near a gun that matched the victim's description of the one used in the robbery.

Donelle gave a statement to an officer in which he claimed that he and Jahan had spent the previous night at a friend's house and had gone directly from there to the gas station where they were arrested. He said that McKinley gave them a ride part of the way. He denied being involved in the robbery or in the unloading of the van.

Jahan also gave a statement, claiming that he and his brother had gone directly to the gas station, but his description of the morning differed from Donelle's as to several details. Jahan changed his story several times during the course of his interview. Eventually, Jahan said that he walked to The Falls that morning, that McKinley and Donelle arrived in the Malibu, and that he (Jahan) and Donelle helped unload packages from the van. Jahan described a "crew" of six members, led by "Big Homie," who planned the robbery.

When confronted with Jahan's version of events, Donelle also changed his story. This time, he stated that the only time he saw McKinley that morning was when McKinley gave him a ride part of the way to the gas station but said that Jahan was with McKinley, not with him, before that. Then, officers left the Mims brothers together in an interview room, taping their conversation. Donelle told Jahan that he had tried to "cover up" for him and, in derogatory terms, said that McKinley should take the blame because he was stupid enough to leave his driver's license and other papers in the car.

The Mims brothers both pled guilty to robbery days before McKinley's trial. At the trial, Jahan testified that his confederate "Big Homie" called him at about 10:00 a.m. on the day of the robbery and said he needed Jahan to go to The Falls apartments to take packages off of a truck. Jahan testified that he took a bus there, and two other men joined him, "D" who was driving the DHL van and "Tray." Then, McKinley arrived in the gray Malibu with Donelle as his passenger. Jahan, "D," and Tray loaded packages from the van into the Malibu. Within five minutes, Tray announced that the police were there, and the men scattered. According to Jahan, he caught up with Donelle, and they ran to the gas station where a police officer encountered them, asked about a carjacking, and then arrested them. Jahan testified that he never talked to McKinley beforehand about the plan to rob a DHL van. Jahan admitted that he lied to the police.

Donelle testified that early on the day of the robbery McKinley picked up him and Jahan and that they ran some errands. McKinley dropped him off at a friend's house; Jahan stayed in McKinley's Malibu. Less than an hour later, Donelle testified, McKinley again

picked him up; Jahan was no longer in McKinley's car. McKinley turned into The Falls apartments and parked beside the DHL delivery van. Donelle testified that he saw Jahan unloading the van and surmised that a robbery was in progress. According to Donelle, there had been previous discussions among McKinley, four of McKinley's friends, Jahan, and himself about "where the [DHL] truck goes and what is on it," but that Jahan was alone when he and McKinley arrived in the Malibu. When he saw Jahan unloading the van, Donelle counseled him to get out of the van because "it's not going to work," but Jahan continued to move packages. Donelle told McKinley and Jahan that a patrol car was approaching, and then he and Jahan walked from the apartments to the gas station. Donelle admitted that he lied to the police to cover up for his brother's involvement.

McKinley took the stand and denied any involvement in the robbery and denied knowing anyone named "Big Homie," "D" or Tray. He testified that on the morning of June 18, 2007, he went to the DeKalb County Recorder's Court to resolve the citations that were found in the Malibu.[1] According to McKinley, his cousins Donelle and Jahan rode with him to the courthouse, then borrowed the car. Although the citations directed him to appear at 2:00 p.m., McKinley testified that he had assumed that the time was 9:00 a.m. and that he arrived at the court at 8:30 a.m. to ensure that he got checked in on time. He testified that the bill of sale and insurance documents found in the Malibu were the documents he needed to have the charges of unregistered vehicle and no proof of insurance dismissed. Because he inadvertently left those documents behind in the Malibu, he testified, he asked for and received a continuance. McKinley testified that he was ready to leave the court by 10:45 a.m., but the Mims brothers failed to return to pick him up as agreed, so he took public transportation.

In rebuttal, the State introduced, as State's Exhibits 21 and 22, copies of two of the traffic citations, certified by the clerk of the DeKalb County Recorder's Court, that were stamped "FTA."[2]

Although the evidence was conflicting, there was some competent evidence to support each fact necessary to show that McKinley either committed the robbery or participated as a party to the crime, including the victim's testimony that a gray car seemed to be following him before the robbery, Donelle Mims' testimony that McKinley discussed the plan to rob a DHL delivery van before the

---

[1] The citations had been introduced into evidence during an officer's testimony.

[2] The prosecuting attorney argued to the jury that the "FTA" stamp established that McKinley had failed to appear as scheduled for his court date. See Division 2, infra.

crime, and the Mims brothers' testimony that immediately after the crime McKinley drove to The Falls apartments, where stolen goods were loaded into his car. *Olds v. State*, 293 Ga. App. 884, 886-887 (1) (668 SE2d 485) (2008). Consequently, McKinley's sufficiency argument fails.

2. McKinley contends that the trial court erred in admitting, over his hearsay objection, State's Exhibits 21 and 22, the copies of two traffic citations that were stamped "FTA." The trial court admitted the exhibits "pursuant to the provisions of OCGA § 24-5-20."

That Code section is one specific application of the best evidence rule. Under that rule, "[t]he best evidence which exists of a writing sought to be proved shall be produced, unless its absence shall be satisfactorily accounted for." OCGA § 24-5-4 (a). This means that, "[w]hen a party wishes to prove the contents of a writing[,] that is, what the writing says, the party must produce that writing or give an accounting for why the writing cannot be produced." (Footnote omitted.) Paul S. Milich, Georgia Rules of Evidence, § 8.2 (2d ed., 2002). Generally, the proponent of the evidence must produce the original, but a duplicate is acceptable in certain circumstances. Id. at § 8.3. Properly certified copies of public records are generally allowable under the best evidence rule. Id. "This rule is deemed necessary to preserve the integrity of and access to official records by not removing the originals for use at trial." Id. The Code section relied upon by the trial court, OCGA § 24-5-20, concerns the exemplification of public records transmitted by facsimile.[3]

Pretermitting whether the trial court correctly determined that State's Exhibits 21 and 22 constituted the best evidence of the

---

[3] OCGA § 24-5-20 (b) provides:
As an alternative to an exemplification made by any public officer of the records, documents, papers, or other matters in the office of such public officer in accordance with Code Sections 24-7-20 and 24-7-21, an exemplification transmitted by facsimile or a copy of an exemplification transmitted by facsimile is admissible if:
  (1) The certification by the public officer includes a statement that the certified document is being transmitted by facsimile and the telephone number and location of the facsimile machine transmitting the facsimile; and
  (2) Each page of the document shows the telephone number of the transmitting facsimile machine to be identical to the telephone number shown as a part of the certification by the public officer.
This subsection shall not be construed to require public officers to obtain or maintain facsimile equipment. Public officers are authorized to collect the usual cost of providing exemplifications as provided by law and a reasonable fee for the cost of telephone facsimile transmission. Public officers are authorized to maintain a record of facsimile exemplifications, which may but is not required to include the retention of the exemplification as transmitted by facsimile.

documents pursuant to OCGA § 24-5-20 (b), however, we have held that Code sections that "merely pertain[ ] to evidentiary authentication of documents do not remove hearsay considerations." *McGaha v. State*, 221 Ga. App. 440, 441 (471 SE2d 533) (1996).[4] See OCGA § 24-3-1 (b) ("Hearsay evidence is admitted only in specified cases from necessity."). In *McGaha v. State*, we held that, "OCGA § 24-7-20[5] does not address hearsay concerns, [and, therefore,] it does not require the admission of hearsay merely because the hearsay has been recorded in [a] court record." (Citation omitted.) 221 Ga. App. at 441.[6] We conclude that, like OCGA § 24-7-20, OCGA § 24-5-20 does not address hearsay concerns. Consequently, that Code section does not require the admission of hearsay merely because the hearsay has been recorded in a court record certified by facsimile.

In this case, the State introduced Exhibits 21 and 22 to prove the truth of the statement of the unidentified person who stamped "FTA" on the citations (presumably the clerk of the DeKalb County Recorder's Court) that McKinley failed to appear for his court date. Despite McKinley's strenuous objection to the documents as hearsay, the State argued only the issue of authentication and never identified any exception to the rule prohibiting hearsay that would authorize admitting the documents. The trial court then admitted the exhibits "pursuant to the provisions of OCGA § 24-5-20" without any determination that they fell within an exception to the rule prohibiting the use of hearsay, saying "I think [McKinley's] other objections go to weight rather than threshold admissibility." This was error.

To the extent the State would now argue that the court records at issue in this case were admissible under OCGA § 24-3-14 (b) which provides an exception for the admission of business records

---

OCGA § 24-7-20 provides:
> The certificate or attestation of any public officer, either of this state or any county thereof, shall give sufficient validity or authenticity to any copy or transcript of any record, document, paper of file, or other matter or thing in his respective office, or pertaining thereto, to admit the same in evidence.

[4] See *Clark v. State*, 271 Ga. 6, 11 (6) (515 SE2d 155) (1999) (addressing best evidence concerns and hearsay concerns separately).

[5] See note 3, supra.

[6] We note in comparison that some Code sections that pertain to authentication of documents do address hearsay concerns. For example, we have determined that OCGA § 40-6-392 (f), which provides for the admission of a certificate of inspection of an intoxilyzer under certain circumstances, effectively creates a specific exception to the rule prohibiting hearsay. *Jackson v. State*, 233 Ga. App. 568, 572 (2) (504 SE2d 505) (1998). Where the State satisfies the foundation requirements set out in OCGA § 40-6-392 (f), an intoxilyzer inspection certificate is admissible over the defendant's hearsay objection, and "[a] further foundation under the 'business records exception,' OCGA § 24-3-14 (b), is rendered unnecessary by legislative enactment." Id. at 572-573 (2).

that would otherwise be excluded as hearsay,[7] the record shows that the State failed to lay the required foundation for the application of the business records exception.

> To introduce a writing under the business records exception to the hearsay rule, a witness must lay a foundation indicating that he or she is aware of the method of keeping the documents. It is not required that the witness made the records or kept them under his or her supervision or control. Instead, the witness must be able to testify that the record was made (1) in the regular course of business, and (2) at the time of the event or within a reasonable time of the event. The witness's lack of personal knowledge regarding how the records were created does not render them inadmissible, but merely affects the weight given to the evidence.

(Citations and punctuation omitted.) *Ross v. State*, 298 Ga. App. 525, 527 (680 SE2d 435) (2009).[8] In this case, the State did not call any witness to provide the required foundation. Accordingly, the trial court erred in admitting the exhibits. *In the Interest of Hudson*, 300 Ga. App. 340, 345-346 (2) (685 SE2d 323) (2009); *Ross v. State*, 298 Ga. App. at 526-527; *McGaha v. State*, 221 Ga. App. at 441.

Moreover, we cannot conclude that the error was harmless, as the State contends.

> The test for harmful error is whether it is highly probable that the error contributed to the verdict. In determining whether hearsay testimony is harmful, this court has found inadmissible hearsay which is received over objection does not require a new trial if it appears that the evidence could not have affected the verdict.

(Punctuation and footnote omitted.) *Archer v. State*, 291 Ga. App.

---

[7] Any writing or record . . . made as a memorandum or record of any act, transaction, occurrence, or event shall be admissible in evidence in proof of the act, transaction, occurrence, or event, if the trial judge shall find that it was made in the regular course of any business and that it was the regular course of such business to make the memorandum or record at the time of the act, transaction, occurrence, or event or within a reasonable time thereafter.
OCGA § 24-3-14 (b).

[8] See Paul S. Milich, Georgia Rules of Evidence, § 19.19 (2d ed., 2002) ("If a public record does not fall under a specific statute that admits the records over a hearsay objection, the record might qualify under the business record exception. To do so, the court must find that the record was prepared in the ordinary course of the agency's business at or near the time of the events or transactions described.") (footnote omitted).

175, 177-178 (2) (661 SE2d 230) (2008). As the trial court observed in this case, the admissibility of State's Exhibits 21 and 22 was "certainly a critical issue." Given the many conflicts and gaps in the evidence, see Division 1, supra, and the prosecutor's use of Exhibits 21 and 22 to attack McKinley's alibi, we must conclude that it is highly probable that the erroneous admission of the exhibits contributed to the verdict. *Patterson v. State*, 287 Ga. App. 100, 103-104 (2) (a) (650 SE2d 770) (2007); *Fenimore v. State*, 218 Ga. App. 735, 737-739 (463 SE2d 55) (1995). Accordingly, the judgment is reversed.

3. In light of our holding in Division 2, supra, McKinley's remaining claims of error are moot and not likely to recur on retrial.

*Judgment reversed. Andrews, P. J., and Doyle, J., concur.*

DECIDED MARCH 26, 2010.

*Glynn R. Stepp*, for appellant.

*Daniel J. Porter, District Attorney, Wesley C. Ross, Assistant District Attorney*, for appellee.